**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| DONNA MOORE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>HCA HEALTHCARE, INC.,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND** |

Plaintiff Donna Moore ("Plaintiff"), through counsel, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant HCA Healthcare, Inc. ("HCA" or "Defendant"). Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences and, as to all other matters, upon information and belief, including the investigation of counsel and facts of public record.

## I. NATURE OF THE ACTION

1. This class action arises from HCA's failure to protect the highly sensitive personal information and protected health information that it required its patients and medical residents to provide, and that it collected and stored on its information technology ("IT") systems.

2. HCA is a Nashville, Tennessee-based healthcare company that, as of December 31, 2025, operated 190 hospitals, 121 freestanding ambulatory surgery centers, and 31 freestanding endoscopy centers located in 19 states and England.[1]

[1] HCA Healthcare, Inc., Annual Report (Form 10-K) (fiscal year ended Dec. 31, 2025), https://www.sec.gov/Archives/edgar/data/860730/000119312526044769/hca-20251231.htm (last visited Nov. 3, 2026) ("2025 Form 10-K").

3. According to HCA's own notice to affected individuals, "[o]n August 12, 2026, [HCA] identified suspicious activity involving certain IT systems," and HCA's investigation "determined that an unknown unauthorized party gained access to [HCA's] systems on August 12, 2026, and obtained copies of certain files" containing patient personal information and medical resident personal information (the "Data Breach").[2]

4. The information that HCA allowed to be stolen includes, depending on the individual, names, Social Security numbers, dates of birth, contact information (including personal email addresses and phone numbers), immigration information, medical information, and health insurance information (collectively, "Private Information").[3]

5. The total number of individuals affected by the Data Breach remains unclear. Public reporting, however, states that HCA reported the Data Breach to the Texas Attorney General as affecting 15,096 Texans, and that the Data Breach affected an estimated 55,000 people.[4]

6. Although HCA identified suspicious activity involving its IT systems on August 12, 2026, the notice letters it sent to affected individuals are dated November 2, 2026—82 days later. During that time, Plaintiff and the Class were deprived of the opportunity to take steps to protect themselves.

---

[2] *Notice of Data Breach*, HCA HEALTHCARE (dated Nov. 2, 2026) (sample notice letters submitted to the Massachusetts Office of Consumer Affairs and Business Regulation), https://www.mass.gov/doc/2026-1893-hca-healthcare-inc/download (last visited Nov. 3, 2026) ("Notice Letter").

[3] Notice Letter, *supra* note 2; Tex. Att'y Gen., *Data Security Breach Reports*, https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage.

[4] Giles Bruce, *HCA Data Breach Hits More Than 15,000 People*, BECKER'S HOSP. REV. (Nov. 2, 2026), https://www.beckershospitalreview.com/healthcare-information-technology/cybersecurity/hca-data-breach-hits-more-than-15000-people/ (last visited Nov. 3, 2026); Giles Bruce, *HCA Data Breach Hits 55,000 People*, BECKER'S HOSP. REV. (Nov. 2, 2026), https://www.beckershospitalreview.com/healthcare-information-technology/cybersecurity/hca-data-breach-hits-55000-people/ (last visited Nov. 3, 2026).

7. The Data Breach was not HCA's first. In 2023, HCA notified approximately 11.27 million patients that their information had been stolen from an external storage location.[5] And in July 2026—just weeks before the Data Breach—HCA notified employees that an unauthorized third party had accessed its HCA Global Human Resources website on February 23, 2026, using credentials intercepted through fake HCA authentication portals, and that the impacted information included Social Security numbers and bank account information.[6] HCA was thus on notice that its systems were a target and that its safeguards were inadequate.

8. On information and belief, cybercriminals were able to breach HCA's systems because HCA failed to implement and maintain reasonable data-security safeguards appropriate to the sensitivity of the information it collected and stored, and consistent with well-established standards applicable to healthcare providers. In short, HCA's failures placed the Private Information of Plaintiff and the Class in a vulnerable position—rendering them easy targets for cybercriminals.

9. As a result of the Data Breach, Plaintiff and members of the proposed Class have suffered injury, including the compromise of their Private Information, an imminent and substantial risk of identity theft and fraud (including medical identity theft), the loss of the benefit of their bargain, the diminution in value of their Private Information, and the lost time and expense of responding to the Data Breach.

---

[5] Noah Schwartz, *HCA Notifies 11 Million Patients Affected in Data Breach*, BECKER'S HOSP. REV. (Aug. 14, 2023), https://www.beckershospitalreview.com/healthcare-information-technology/cybersecurity/hca-notifies-11-million-patients-affected-in-data-breach/ (last visited Nov. 3, 2026).

[6] *Notice of Data Breach*, HCA HEALTHCARE (dated July 15, 2026), https://www.classaction.org/media/hca-healthcare-data-breach-letter-2026.pdf (last visited Nov. 3, 2026) ("July 15, 2026 Notice").

10. Plaintiff brings this class action individually and on behalf of all others harmed by HCA's misconduct to recover damages and to obtain injunctive and equitable relief requiring HCA to adopt reasonable security practices adequate to protect the Private Information that remains in its possession.

## II. PARTIES

11. Plaintiff Donna Moore is a natural person and, at all relevant times, a citizen and resident of Mt. Juliet, Wilson County, Tennessee, where Plaintiff intends to remain. Plaintiff has received medical care at TriStar Summit Medical Center, an HCA-affiliated facility, is a retired employee of HCA-affiliated facilities, and provided Private Information to HCA in connection with receiving medical care and obtaining employment.

12. Defendant HCA Healthcare, Inc. is a Delaware corporation with its principal executive offices located at One Park Plaza, Nashville, Tennessee 37203.[7] HCA is therefore a citizen of Delaware and Tennessee.

## III. JURISDICTION AND VENUE

13. This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2). The proposed Class consists of more than 100 members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. The amount in controversy includes, among other things, Class Members' compensatory damages, the costs of mitigation, and the cost of the injunctive relief sought, including credit monitoring and identity theft protection services for a period commensurate with the risk created by the Data Breach. Minimal diversity is satisfied because at least one member of the proposed

[7] 2025 Form 10-K, *supra* note 1.

Class is a citizen of a State different from Defendant. HCA reported the Data Breach to the Texas Attorney General as affecting 15,096 Texans and, according to its Notice Letter and public reporting, the Data Breach also affected residents of Massachusetts and Rhode Island.[8]

14. Upon information and belief, fewer than two-thirds of the members of the proposed Class are citizens of Tennessee. An HCA spokesperson has stated that the individuals affected by the Data Breach are "spread across our U.S. facilities."[9]

15. This Court has personal jurisdiction over HCA because HCA maintains its principal place of business in Nashville, Tennessee, such that it is at home in this District; regularly conducts business in Tennessee; and has sufficient minimum contacts with Tennessee.

16. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because HCA resides in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims—including HCA's decisions concerning the security of the information entrusted to it—occurred in or emanated from this District. Venue is proper in the Nashville Division because HCA's principal executive offices are located in Nashville, Davidson County, Tennessee. *See* 28 U.S.C. § 123(b)(1).

---

[8] Tex. Att'y Gen., *Data Security Breach Reports*, *supra* note 3; Notice Letter, *supra* note 2 ("This incident affected 5 Rhode Island residents."); Bruce, *HCA Data Breach Hits More Than 15,000 People*, *supra* note 4.

[9] Bruce, *HCA Data Breach Hits 55,000 People*, *supra* note 4.

## IV. FACTUAL ALLEGATIONS

### A. HCA Collects and Stores Sensitive Patient and Employee Information.

17. HCA operates general acute care, behavioral, and rehabilitation hospitals, freestanding ambulatory surgery centers, and freestanding endoscopy centers in 19 states and England.[10] HCA reported total revenues of $75.6 billion for 2025.[11]

18. In the ordinary course of its business, HCA requires patients who receive care at HCA-affiliated facilities or physician offices to provide sensitive personal and medical information as a condition of receiving care. HCA likewise requires its medical residents to provide sensitive personal information in connection with their employment.

19. As HCA's Notice Letter confirms, the information HCA collects and maintains includes, among other things, "personal information [patients] provided when [they] received care at one or more HCA Healthcare-affiliated facilities or physician offices," and "Human Resources information [medical residents] provided . . . in connection with [their] employment, including [their] name, Social Security number, date of birth, contact information, including personal email address and phone number, and immigration information (where applicable)."[12]

20. Plaintiff and Class Members entrusted this information to HCA with the reasonable expectation that HCA would safeguard it and use it only for legitimate purposes, consistent with HCA's legal obligations and its own representations. After all, Plaintiff and Class Members themselves took reasonable steps to secure their Private Information.

---

[10] 2025 Form 10-K, *supra* note 1.

[11] *Id.*

[12] Notice Letter, *supra* note 2.

21. Upon information and belief, HCA and its affiliated facilities are covered entities under the Health Insurance Portability and Accountability Act ("HIPAA") and, as such, were obligated to furnish patients with a notice of privacy practices and to safeguard their protected health information. *See* 45 C.F.R. § 164.520. Upon information and belief, HCA maintained a notice of privacy practices in which it represented that it would protect the confidentiality of patient information and would use and disclose that information only for permitted purposes.

22. HCA understood the risks posed by its collection of this information. In its 2025 Form 10-K, HCA acknowledged that "[c]ybersecurity incidents or other forms of data breaches could result in the compromise of our facilities," that "[a] cybersecurity incident or other form of data breach could also give rise to potential harm to patients," and that "[o]ur operations could be impaired by a failure in or breach of our information systems."[13]

23. Under state and federal law, businesses like HCA have duties to protect the Private Information in their possession and to notify affected individuals about breaches.

**B. The Data Breach.**

24. HCA's Notice Letter, dated November 2, 2026, states:

> On August 12, 2026, we identified suspicious activity involving certain IT systems. We promptly took steps to secure those systems, began an investigation with the help of outside cybersecurity experts, and notified law enforcement. Our investigation determined that an unknown unauthorized party gained access to our systems on August 12, 2026, and obtained copies of certain files containing [patient / medical resident] personal information.[14]

[13] 2025 Form 10-K, *supra* note 1.

[14] Notice Letter, *supra* note 2. HCA issued separate versions of the Notice Letter to patients and to medical residents; the quoted language is identical in both versions except that the patient version refers to "patient personal information" and the medical resident version refers to "medical resident personal information."

25. For medical residents, HCA stated that "the files contained Human Resources information you provided to us in connection with your employment, including your name, Social Security number, date of birth, contact information, including personal email address and phone number, and immigration information (where applicable)."[15]

26. For patients, HCA stated that "the affected files contained certain personal information you provided when you received care at one or more HCA Healthcare-affiliated facilities or physician offices."[16] HCA's filing with the Texas Attorney General identifies the categories of information affected as including Social Security numbers, medical information, and health insurance information.[17] An HCA spokesperson has described the compromised data as "nonfinancial personal information and protected health information."[18]

27. Public reporting further indicates that the unauthorized party gained access to HCA's systems through a third-party vendor.[19] HCA's Notice Letter does not disclose how the unauthorized party gained access to HCA's systems, what vulnerability was exploited, or what systems were compromised. Nor has HCA disclosed the identity of the third-party vendor through which the unauthorized party reportedly gained access, whether the stolen data has appeared on the dark web or been otherwise disseminated, or whether HCA has been subject to any ransom demand in connection with the Data Breach.

28. HCA's acknowledgment that the unauthorized party "obtained copies of certain files" confirms that this was not merely unauthorized viewing of data; it was active exfiltration—

---

[15] *Id.*

[16] *Id.*

[17] Tex. Att'y Gen., *Data Security Breach Reports*, *supra* note 3.

[18] Bruce, *HCA Data Breach Hits 55,000 People*, *supra* note 4.

[19] *Id.*

the unauthorized copying and removal of data from HCA's possession to a location controlled by the unauthorized party. Once removed from a healthcare provider's systems by an unauthorized actor, there is no mechanism to retrieve, recall, or "un-steal" the data.

29. According to public reporting, HCA reported the Data Breach to Massachusetts regulators on or about October 29, 2026, and to the Texas Attorney General on or about October 30, 2026, and published a public notice of the Data Breach on or about October 29, 2026.[20] HCA did not begin mailing notice letters to affected individuals until on or about November 2, 2026.[21]

30. HCA has offered affected individuals two years of identity theft protection services through IDX, a tacit acknowledgment that the Data Breach created a risk of identity theft and fraud.[22] Two years of monitoring is inadequate given that the stolen Private Information—including Social Security numbers, dates of birth, and medical information—cannot be changed and can be misused for many years.

31. Currently, the precise number of persons injured is unclear. But upon information and belief, the size of the putative Class can be ascertained from information in HCA's custody and control.

32. HCA failed its duties when its inadequate security practices caused the Data Breach. HCA's negligence is evidenced by its failure to prevent the Data Breach and to stop cybercriminals from accessing and copying the Private Information. HCA caused widespread injury and monetary damages.

---

[20] Bruce, *HCA Data Breach Hits More Than 15,000 People*, *supra* note 4; Bruce, *HCA Data Breach Hits 55,000 People*, *supra* note 4.

[21] Bruce, *HCA Data Breach Hits 55,000 People*, *supra* note 4; Notice Letter, *supra* note 2.

[22] Notice Letter, *supra* note 2.

## C. HCA Was on Notice of the Threat to the Information in Its Custody.

33. HCA had specific, prior notice that its systems and the sensitive information stored on them were targets for cybercriminals.

34. In 2023, HCA notified approximately 11.27 million patients that their information—including names, cities, states, ZIP codes, email addresses, telephone numbers, dates of birth, gender, and service dates, locations, and next appointment dates—had been stolen from an external storage location.[23] HCA reached a settlement of the resulting consolidated class action litigation in this District, which a federal court approved in October 2025.[24]

35. Then, in a notice letter dated July 15, 2026, HCA informed employees that "[o]n February 23, 2026, an unauthorized third party accessed the HCA Global Human Resources website . . . and changed the direct deposit information for certain HCA employees," and that "[t]he third party intercepted the credentials needed to access the Website by creating fake HCA authentication portals."[25] HCA stated that the impacted information included employees' "name, employee identification number, employee 3-4 ID, phone number, Social Security Number, address, email address, and bank account information, including checking account and routing numbers."[26]

36. Despite these prior incidents, upon information and belief, HCA failed to implement the safeguards necessary to prevent an unauthorized party from gaining access to its systems on August 12, 2026, and copying files containing the Private Information of Plaintiff and the Class.

---

[23] Schwartz, *HCA Notifies 11 Million Patients Affected in Data Breach*, *supra* note 5.

[24] Bruce, *HCA Data Breach Hits 55,000 People*, *supra* note 4.

[25] July 15, 2026 Notice, *supra* note 6.

[26] *Id.*

## D. Cyberattacks Targeting Healthcare Providers Were a Known and Escalating Threat.

37. HCA's data security obligations were particularly important given the substantial increase in cyberattacks and data breaches in recent years.

38. In 2024, 3,158 data compromises were reported—resulting in approximately 1,350,835,988 victim notices (a 211% increase year over year).[27] Data breaches affecting the healthcare sector have become routine and are among the most common categories of reported data compromises.[28]

39. Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[29]

40. The Cybersecurity and Infrastructure Security Agency, together with partner agencies, has published and repeatedly updated detailed guidance identifying cyberattacks as a pervasive threat and prescribing specific, freely available defensive controls.[30] Federal healthcare regulators have specifically advised covered entities that cyberattacks against protected health

---

[27] Identity Theft Res. Ctr., *2024 Data Breach Report* (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf (last visited Nov. 3, 2026).

[28] Identity Theft Res. Ctr., *2025 Data Breach Report* (Jan. 2026), https://www.idtheftcenter.org/wp-content/uploads/2026/01/2025-ITRC-Annual-Data-Breach-Report.pdf (last visited Nov. 3, 2026).

[29] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[30] Cybersecurity & Infrastructure Sec. Agency & Multi-State Info. Sharing & Analysis Ctr., *#StopRansomware Guide* (updated Mar. 2025), https://www.cisa.gov/sites/default/files/2025-03/StopRansomware-Guide%20508.pdf (last visited Nov. 3, 2026).

information are foreseeable and that entities must prepare contingency and response plans in advance.[31]

41. The methods by which threat actors gain access to victim networks are well documented and defensible. Attackers routinely exploit known, publicly cataloged software vulnerabilities for which patches are available, compromise credentials through phishing, and move laterally through networks that lack segmentation and monitoring. Federal authorities maintain and continuously update a public catalog of known exploited vulnerabilities precisely so that organizations can prioritize remediation and close these avenues of attack.[32]

42. Therefore, the increase in such attacks, and the attendant risk of future attacks, was widely known to the public and to anyone in HCA's industry, including HCA.

**E. HCA Could Have Prevented the Data Breach.**

43. Data breaches are preventable.[33] As the author of the American Bar Association's *Data Breach and Encryption Handbook* explained:

a. "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[34]

---

[31] U.S. Dep't of Health & Human Servs., Off. for Civil Rights, *Fact Sheet: Ransomware and HIPAA* (Sept. 20, 2021), https://www.hhs.gov/hipaa/for-professionals/security/guidance/cybersecurity/ransomware-fact-sheet/index.html (last visited Nov. 3, 2026).

[32] Cybersecurity & Infrastructure Sec. Agency, *Known Exploited Vulnerabilities Catalog*, https://www.cisa.gov/known-exploited-vulnerabilities-catalog (last visited Nov. 3, 2026).

[33] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy L. Thomson ed., 2012).

[34] *Id.* at 17.

b. "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[35]

c. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs."[36]

44. Because these attack methods are known and the corresponding defenses are established, a successful intrusion of the kind alleged here is consistent with a failure to implement one or more baseline safeguards, such as timely patching, multifactor authentication, vendor and third-party access management, network segmentation, and continuous monitoring.[37]

**F. The HIPAA Security Rule Reflects the Applicable Standard of Care.**

45. As a healthcare provider, HCA was subject to the HIPAA Security Rule, which establishes a nationally recognized framework for safeguarding electronic protected health information. Plaintiff references the Security Rule solely as evidence of the applicable standard of care, not as an independent cause of action and not as a basis for negligence per se.

46. The Security Rule requires covered entities to ensure the confidentiality, integrity, and availability of the electronic protected health information they create, receive, maintain, or transmit; to protect against reasonably anticipated threats or hazards to the security of that

---

[35] *Id.* at 28.

[36] *Id.*

[37] CISA & MS-ISAC, *#StopRansomware Guide*, *supra* note 30.

information; to protect against reasonably anticipated impermissible uses or disclosures; and to ensure workforce compliance. *See* 45 C.F.R. § 164.306(a).

47. The Security Rule further requires covered entities to implement administrative, physical, and technical safeguards, including access controls that limit information-system access to authorized persons and software, audit controls, integrity controls, and transmission security. *See* 45 C.F.R. §§ 164.308, 164.310, 164.312.

48. The U.S. Department of Health and Human Services ("HHS") has long published guidance elaborating on these obligations and confirming that basic safeguards and cyber-preparedness are longstanding expectations for entities holding protected health information.[38]

49. For healthcare organizations specifically, HHS, through its 405(d) program, has identified a set of practical safeguards keyed to the sector's most significant threats, including email protection, endpoint protection, access management, data protection and loss prevention, and vulnerability management.[39] HHS has separately articulated sector cybersecurity performance goals emphasizing multifactor authentication, encryption, credential management, third-party vendor risk management, and incident planning as foundational.[40]

---

[38] U.S. Dep't of Health & Human Servs., Off. for Civil Rights, *Security Rule Guidance Material*, https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited Nov. 3, 2026).

[39] U.S. Dep't of Health & Human Servs., 405(d) Program, *Health Industry Cybersecurity Practices: Managing Threats and Protecting Patients* (2023 ed.), https://405d.hhs.gov/Documents/HICP-Main-508.pdf (last visited Nov. 3, 2026).

[40] U.S. Dep't of Health & Human Servs., *Healthcare and Public Health Sector-Specific Cybersecurity Performance Goals* (2024), https://hhscyber.hhs.gov/documents/cybersecurity-performance-goals.pdf (last visited Nov. 3, 2026).

50. HCA's failure to prevent the unauthorized access to and copying of protected health information supports the inference that HCA did not meet the standard of care that the Security Rule reflects.

## G. HCA Failed to Follow FTC Guidelines.

51. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. Thus, the FTC has issued numerous guidelines identifying best data security practices that businesses—like HCA—should use to protect against unlawful data exposure.

52. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[41] The FTC declared that, *inter alia*, businesses must:

a. protect the personal customer information that they keep;

b. properly dispose of personal information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

53. The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

54. Furthermore, the FTC explains that companies must:

a. not maintain information longer than is needed to authorize a transaction;

b. limit access to sensitive data;

[41] Fed. Trade Comm'n, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Nov. 3, 2026).

c. require complex passwords to be used on networks;

d. use industry-tested methods for security;

e. monitor for suspicious activity on the network; and

f. verify that third-party service providers use reasonable security measures.

55. The FTC has likewise emphasized building security into operations from the outset, including access controls, strong authentication, network segmentation and monitoring, and timely patching.[42]

56. The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

57. In short, HCA's failure to use reasonable and appropriate measures to protect against unauthorized access to sensitive data constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

**H. HCA Failed to Follow Industry Standards.**

58. Several best practices have been identified that—at a minimum—should be implemented by businesses like HCA. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software;

[42] Fed. Trade Comm'n, *Start with Security: A Guide for Business* (June 2015), https://www.ftc.gov/business-guidance/resources/start-security-guide-business (last visited Nov. 3, 2026).

encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees and third parties can access sensitive data.

59. Widely recognized technical frameworks define the baseline of reasonable security. The National Institute of Standards and Technology ("NIST") publishes a comprehensive catalog of security and privacy controls addressing access control, identification and authentication, audit and accountability, incident response, risk assessment, and system and information integrity.[43] The Center for Internet Security ("CIS") publishes a prioritized set of Critical Security Controls—including inventory and control of assets, continuous vulnerability management, controlled use of administrative privileges, maintenance and monitoring of audit logs, malware defenses, and data protection—that represents industry consensus on the safeguards a reasonable organization must implement.[44]

60. Upon information and belief, HCA failed to implement one or more of these well-established safeguards, including, among others, adequate access controls and authentication, oversight of third-party vendor access to its systems, network monitoring and intrusion detection, timely patching and vulnerability management, encryption of sensitive data at rest, and workforce training, and that failure was a direct and proximate cause of the Data Breach.

61. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, HCA opened the door to the criminals—thereby causing the Data Breach.

---

[43] Joint Task Force, Nat'l Inst. of Standards & Tech., *Security and Privacy Controls for Information Systems and Organizations*, NIST Special Publication 800-53, Rev. 5 (Sept. 2020), https://doi.org/10.6028/NIST.SP.800-53r5 (last visited Nov. 3, 2026).

[44] Ctr. for Internet Sec., *CIS Critical Security Controls* (v8.1), https://www.cisecurity.org/controls/v8-1 (last visited Nov. 3, 2026).

## I. HCA Failed to Provide Timely Notice.

62. Upon discovering a cyberattack, a healthcare entity is expected to promptly identify and respond to the incident, mitigate harm, and provide affected individuals with timely and accurate notice of the nature and scope of the compromise.[45] Established incident-response guidance requires organizations to integrate incident handling into their broader risk-management program to reduce impact and speed detection, response, and recovery.[46] The FTC's data-breach-response guidance similarly directs organizations to secure their systems, remediate vulnerabilities, and provide required notifications without delay.[47]

63. The HIPAA Breach Notification Rule requires covered entities to notify affected individuals of a breach of unsecured protected health information without unreasonable delay and in no case later than 60 calendar days after discovery of the breach. *See* 45 C.F.R. § 164.404(b). This provision is referenced as a benchmark for the notice HCA owed, not as an independent cause of action.

64. Timely and accurate notice is essential because it enables affected individuals to take protective measures—such as monitoring accounts, placing fraud alerts and credit freezes, and scrutinizing medical and insurance records—before their information is misused.

---

[45] U.S. Dep't of Health & Human Servs., Off. for Civil Rights, *My Entity Just Experienced a Cyber-Attack! What Do We Do Now? A Quick-Response Checklist* (June 2017), https://www.hhs.gov/sites/default/files/cyber-attack-checklist-06-2017.pdf (last visited Nov. 3, 2026).

[46] Nat'l Inst. of Standards & Tech., *Incident Response Recommendations and Considerations for Cybersecurity Risk Management: A CSF 2.0 Community Profile*, NIST Special Publication 800-61, Rev. 3 (Apr. 2025), https://csrc.nist.gov/pubs/sp/800/61/r3/final (last visited Nov. 3, 2026).

[47] Fed. Trade Comm'n, *Data Breach Response: A Guide for Business* (Aug. 2023), https://www.ftc.gov/business-guidance/resources/data-breach-response-guide-business (last visited Nov. 3, 2026).

65. HCA identified suspicious activity involving its IT systems on August 12, 2026, and its investigation later determined that the unauthorized party had gained access to its systems that same day. Yet HCA's Notice Letters are dated November 2, 2026—82 days later. HCA has not publicly explained the reason for this interval between discovery and notice, during which Plaintiff and the Class were deprived of the opportunity to protect themselves.

66. Under the HITECH Act, covered entities must likewise notify affected individuals of a breach of unsecured protected health information without unreasonable delay and in no case later than 60 calendar days after discovery of the breach. 42 U.S.C. § 17932(a), (d)(1). A breach is treated as discovered on the first day it is known, or by exercising reasonable diligence would have been known, to the covered entity. *Id.* § 17932(c); 45 C.F.R. § 164.404(a)(2). HCA has acknowledged that the unauthorized access occurred, and that HCA identified the suspicious activity, on August 12, 2026, and that the unauthorized party copied files from HCA's systems. Upon information and belief, HCA knew, or by exercising reasonable diligence would have known, that the incident constituted a breach of unsecured protected health information on or about August 12, 2026, or shortly thereafter. If HCA knew or should have known of the Data Breach on or before September 2, 2026, its Notice Letters dated November 2, 2026, exceeded the 60-day outer limit. HCA has further acknowledged that it notified law enforcement, but its Notice Letter does not state that notification was delayed at the request of law enforcement. *See* 45 C.F.R. § 164.412. In any event, the 60-day period is an outer limit, not a safe harbor; the law independently requires notification without unreasonable delay, and HCA has not disclosed any circumstance justifying the 82-day interval between its identification of the unauthorized activity and individual notification.

67. Moreover, HCA's Notice Letter is deficient. It does not explain how the unauthorized party gained access to HCA's systems, which systems were affected, or what HCA has done to prevent a recurrence, leaving Plaintiff and the Class unable to fully assess the risk they face.

## V. PLAINTIFF'S EXPERIENCES AND INJURIES

68. Plaintiff Donna Moore has received medical care at TriStar Summit Medical Center in Hermitage, Tennessee, an HCA-affiliated facility. Plaintiff is also a retired employee of TriStar Summit Medical Center and Skyline Medical Center in Hermitage, Tennessee and Madison, Tennessee, respectively.

69. As a condition of receiving care and obtaining employment, Plaintiff was required to provide HCA with Plaintiff's Private Information. HCA used that Private Information to facilitate Plaintiff's treatment and employment as part of the parties' relationship.

70. Thus, HCA obtained and maintained, and continues to maintain, Plaintiff's Private Information.

71. Plaintiff provided Private Information to HCA and trusted that HCA would use reasonable measures to protect it according to HCA's internal policies, as well as state and federal law. HCA obtained and continues to maintain Plaintiff's information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

72. Plaintiff is very careful about the privacy and security of Plaintiff's Private Information. Plaintiff does not knowingly transmit Private Information over the internet in an unsafe manner. Plaintiff is careful to store any documents containing Private Information in a secure location.

73. Through its Data Breach, HCA compromised Plaintiff's Private Information.

74. Since learning of the Data Breach, Plaintiff has spent—and will continue to spend—time and effort monitoring accounts and records to protect against identity theft and fraud, including reviewing statements from all of her credit cards and her bank.

75. Plaintiff suffered actual injury from the exposure and theft of Plaintiff's Private Information—which violates Plaintiff's privacy rights.

76. Plaintiff suffered actual injury in the form of damages to and diminution in the value of Plaintiff's Private Information. After all, Private Information is a form of intangible property—property that HCA was required to adequately protect.

77. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because HCA's Data Breach placed Plaintiff's Private Information in the hands of criminals.

78. Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try to mitigate Plaintiff's injuries.

79. Plaintiff has a continuing interest in ensuring that Plaintiff's Private Information—which, upon information and belief, remains in HCA's possession—is protected and safeguarded from additional breaches.

## VI. INJURIES COMMON TO PLAINTIFF AND THE CLASS

### A. Consumers Prioritize Data Security.

80. In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[48] Therein, Cisco reported the following:

---

[48] Cisco, *Privacy Awareness: Consumers Taking Charge to Protect Personal Information* (2024), https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited Nov. 3, 2026).

a. “For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won’t purchase from an organization they don’t trust with their data.”[49]

b. “Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly.”[50]

c. 89% of consumers stated that “I care about data privacy.”[51]

d. 83% of consumers declared that “I am willing to spend time and money to protect data” and that “I expect to pay more” for privacy.[52]

e. 51% of consumers revealed that “I have switched companies or providers over their data policies or data-sharing practices.”[53]

f. 75% of consumers stated that “I will not purchase from organizations I don’t trust with my data.”[54]

81. Other surveys are in accord. According to a survey conducted by cybersecurity firm FireEye, approximately 50% of consumers consider data security to be a main or important factor in purchasing decisions, and nearly the same percentage would pay more to work with a provider

---

[49] *Id.* at 3.

[50] *Id.*

[51] *Id.* at 9.

[52] *Id.*

[53] *Id.*

[54] *Id.* at 11.

that maintains better data security. Seventy percent of consumers would provide less personal information to organizations that have suffered a data breach.[55] These findings underscore the concrete economic value that Plaintiff and Class Members placed on HCA's implicit promise to safeguard their Private Information.

## B. Plaintiff and the Class Suffered Common Injuries and Damages.

82. Because of HCA's failure to prevent the Data Breach, Plaintiff and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a. loss of the opportunity to control how their Private Information is used;

b. diminution in value of their Private Information;

c. compromise and continuing publication of their Private Information;

d. out-of-pocket costs from trying to prevent, detect, and recover from identity theft, medical identity theft, and fraud;

e. lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identity theft and fraud;

f. delay in receipt of tax refund monies;

g. unauthorized use of their stolen Private Information; and

---

[55] FireEye, Inc., *Beyond the Bottom Line: The Real Cost of Data Breaches* (2016), https://web.archive.org/web/20210422161745/https://www.fireeye.com/blog/executive-perspective/2016/05/beyond_the_bottomli.html (last visited Nov. 3, 2026).

h. continued risk to their Private Information—which remains in HCA's possession—and is thus at risk for future breaches so long as HCA fails to take appropriate measures to protect the Private Information.

83. These injuries flow directly from HCA's common course of conduct and are common to Plaintiff and every member of the Class.

### C. Substantially Increased Risk of Identity Theft and Fraud.

84. Plaintiff and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

85. Even for those individuals who have not yet experienced actual identity theft or fraud, the exfiltration of their Private Information by a criminal actor establishes a concrete and imminent injury that is not speculative. Where, as here, data has been actually obtained by an unauthorized third party, affected individuals are injured by the sufficiently imminent risk of future harm alone. *See Galaria v. Nationwide Mut. Ins. Co.*, 663 F. App'x 384, 388 (6th Cir. 2016).

86. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 C.F.R. § 603.2(a).

87. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.* § 603.2(b).

88. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market (*i.e.*, the

dark web) to other criminals who then utilize the information to commit a variety of identity theft-related crimes discussed below.

89. The "dark web" is an unindexed layer of the internet that requires special software or authentication to access.[56] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

90. The Social Security Administration has explained that a compromised Social Security number can be used to commit tax fraud, benefits fraud, employment fraud, and financial fraud, and that the harms may recur over time.[57] Identity thieves can use an individual's personal data to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[58]

91. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting

---

[56] *What Is the Dark Web?*, EXPERIAN, https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited Nov. 3, 2026).

[57] Soc. Sec. Admin., *Identity Theft and Your Social Security Number*, SSA Pub. No. 05-10064 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Nov. 3, 2026).

[58] *Id.*

from the Data Breach may go undetected until debt collection calls commence months, or even years, later. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

92. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[59] The U.S. Government Accountability Office has found that stolen data may remain dormant for a year or more before it is used, and that fraudulent use can continue for years thereafter, such that the full extent of harm from a breach often cannot be measured immediately.[60] Federal consumer-protection authorities have likewise cautioned that the absence of immediate confirmed fraud does not negate the present risk that stolen information will be misused.[61]

93. Malicious actors frequently wait months or years before using Private Information obtained through data breaches, as victims become complacent and less diligent in monitoring their accounts after the initial period following a breach. These bad actors also reuse stolen Private Information, meaning affected individuals can be victims of multiple crimes stemming from a single breach. Moreover, individuals are injured each time their data is traded on underground markets, even if they have been victims of previous data breaches, because the dark web comprises

---

[59] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. SYSTEMICS, CYBERNETICS & INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf (last visited Nov. 3, 2026).

[60] U.S. Gov't Accountability Off., *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO-07-737 (June 4, 2007), https://www.gao.gov/products/gao-07-737 (last visited Nov. 3, 2026).

[61] Ari Lazarus, *How Fast Will Identity Thieves Use Stolen Info?*, FED. TRADE COMM'N (May 24, 2017), https://consumer.ftc.gov/consumer-alerts/2017/05/how-fast-will-identity-thieves-use-stolen-info (last visited Nov. 3, 2026).

multiple discrete repositories of stolen information that can be aggregated or accessed by different criminal actors for various fraudulent purposes.

94. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

95. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

96. One example of criminals piecing together bits and pieces of compromised Private Information to create comprehensive dossiers on individuals is called "Fullz" packages.[62] With

---

[62] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, Social Security number, date of birth, and more. As a rule of thumb, the more information one has on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, KREBS ON SECURITY (Sept. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm (last visited Nov. 3, 2026).

"Fullz" packages, cybercriminals can cross-reference two sources of personal information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

97. The development of "Fullz" packages means that the Private Information exposed in the Data Breach can easily be linked to data of Plaintiff and the Class that is available on the internet. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information stolen in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

98. According to the FBI's Internet Crime Complaint Center ("IC3") 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[63]

99. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Yet HCA failed to rapidly report to Plaintiff and the Class that their Private Information was stolen. HCA's failure to promptly and properly notify Plaintiff and Class Members of the Data Breach exacerbated their injuries by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take other necessary steps to mitigate the harm caused by the Data Breach.

100. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

---

[63] Fed. Bureau of Investigation, *2019 Internet Crime Report Released* (Feb. 11, 2020), https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited Nov. 3, 2026).

101. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports, continuously monitor their reports for future inaccuracies, close existing bank and credit accounts, open new ones, and dispute charges with creditors.

102. Identity theft and the compromise of sensitive medical information also exact a severe emotional toll on victims. According to the Identity Theft Resource Center's 2021 Consumer Aftermath Report, among victims of identity crimes: 84% reported anxiety; 76% felt violated; 32% experienced financial-related identity problems; 83% reported being turned down for credit or loans; 32% reported problems with family members as a result of the breach; and 10% reported feeling suicidal. Victims also reported physical symptoms: 48% experienced sleep disturbances; 37% reported an inability to concentrate or focus; 29% were unable to go to work because of physical symptoms; 23% reported new physical illnesses; and 13% reported a start or relapse into unhealthy or addictive behaviors.[64]

103. The U.S. Department of Justice's Bureau of Justice Statistics has found that identity theft victims reported spending an average of seven hours resolving issues related to identity theft or fraud.[65]

---

[64] Identity Theft Res. Ctr., *2021 Consumer Aftermath Report: How Identity Crimes Impact Victims, Their Families, Friends, and Workplaces* (May 2021), https://www.idtheftcenter.org/wp-content/uploads/2021/09/ITRC_2021_Consumer_Aftermath_Report.pdf (last visited Nov. 3, 2026).

[65] Erika Harrell, *Victims of Identity Theft, 2014*, BUREAU OF JUST. STAT. (Sept. 2015), https://bjs.ojp.gov/library/publications/victims-identity-theft-2014 (last visited Nov. 3, 2026).

## D. Protected Health Information Is Uniquely Valuable and Uniquely Dangerous When Stolen.

104. Protected health information is among the most valuable categories of data to criminals because it is rich, durable, and difficult to remediate. A single medical record may combine identifying information, insurance details, and clinical history—information that cannot be cancelled or reissued the way a payment card can.

105. The Private Information compromised in the Data Breach commands a significant price on underground criminal markets. Numerous sources report dark web pricing for stolen identity credentials: personal information sells for $40 to $200 per record, and bank or insurance details command $50 to $200. Stolen credit or debit card numbers sell for $5 to $110, while access to entire company data breaches is sold for $900 to $4,500.[66] Compared to credit card information, personally identifiable information and medical records are worth substantially more on the black market because they cannot be cancelled or reissued.[67]

106. The combination of data elements compromised—which, depending on the individual, links names with Social Security numbers, dates of birth, contact information, medical information, and insurance information—creates a comprehensive profile that cybercriminals can leverage for targeted attacks. For instance, a criminal possessing a victim's medical and insurance information can craft highly convincing phishing communications that reference specific medical

---

[66] Anita George, *Your Personal Data Is for Sale on the Dark Web. Here's How Much It Costs*, DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Nov. 3, 2026).

[67] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, NETWORK WORLD (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Nov. 3, 2026).

details, dramatically increasing the likelihood that the victim will respond and disclose additional sensitive information.

107. Unlike a compromised payment-card number, which a consumer can cancel to cut off the risk of further misuse, core identifiers such as Social Security numbers, dates of birth, and medical histories are effectively immutable. Once stolen, they can be exploited for years, and the harm compounds over time.[68]

108. Stolen health information enables medical identity theft, in which a criminal uses another person's identity or insurance to obtain treatment, prescriptions, or services, corrupting the victim's medical and insurance records and creating risks to both finances and health that can be extraordinarily difficult to unwind.

109. When a criminal uses stolen protected health information to obtain medical care under another person's identity, it can result in: (a) incorrect information being added to the victim's medical records, potentially leading to misdiagnosis or inappropriate treatment; (b) fraudulent insurance claims that exhaust the victim's benefits; (c) collection actions against the victim for medical debts the victim did not incur; and (d) years of effort to identify and correct the resulting errors.

110. It is within this context that Plaintiff and all other Class Members must now live with the knowledge that their Private Information is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market. To protect themselves, Plaintiff and Class Members will need to remain vigilant for years or even decades to come.

---

[68] Soc. Sec. Admin., *Identity Theft and Your Social Security Number*, *supra* note 57.

### E. Plaintiff and the Class Lost the Benefit of Their Bargain.

111. A portion of the value that Plaintiff and the Class conferred on HCA—whether through direct payment, insurance, or public funding tied to their care, or through their labor—was reasonably understood to fund the reasonable data security that HCA was expected to maintain. HCA did not deliver that security.

112. Plaintiff and the Class therefore did not receive the full benefit of their bargain. Had they known that HCA would not maintain reasonable safeguards for their sensitive information, they would have paid less for HCA's services, taken additional protective measures, or declined to provide certain information.

### F. The Private Information of Plaintiff and the Class Remains at Risk.

113. Upon information and belief, HCA continues to maintain the Private Information of Plaintiff and the Class in its systems, and HCA has not demonstrated that it has remediated the deficiencies that permitted the Data Breach—or the prior incidents described above—or adopted safeguards sufficient to prevent a recurrence.

114. So long as HCA retains this information without adopting reasonable safeguards, Plaintiff and the Class face a continuing risk of further unauthorized access and disclosure. Injunctive and equitable relief is therefore necessary and appropriate.

## VII. CLASS ACTION ALLEGATIONS

115. Plaintiff brings this class action under Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23(c)(4), individually and on behalf of all members of the following class (the "Class"):

> All individuals residing in the United States whose Private Information was accessed, acquired, or otherwise compromised in the Data Breach that HCA identified on or about August 12, 2026,

> including all individuals to whom HCA sent notice of the Data Breach.

116. Excluded from the Class are HCA, its agents, affiliates, parents, subsidiaries, any entity in which HCA has a controlling interest, any HCA officer or director, any successor or assign, and any Judge who adjudicates this case, including the Judge's staff and immediate family.

117. Plaintiff reserves the right to modify or amend the Class definition, including to add one or more subclasses, as discovery proceeds and the scope of the Data Breach is confirmed.

118. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of Plaintiff's claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

119. **Ascertainability.** All members of the proposed Class are readily ascertainable from information in HCA's custody and control. Indeed, HCA has already identified and sent notice letters to affected individuals.

120. **Numerosity (Rule 23(a)(1)).** The Class Members are so numerous that joinder of all Class Members is impracticable. HCA reported to the Texas Attorney General that the Data Breach affected 15,096 Texans, and public reporting indicates the Data Breach affected an estimated 55,000 people.

121. **Commonality and Predominance (Rules 23(a)(2) and 23(b)(3)).** Plaintiff's and the Class's claims raise predominantly common questions of fact and law—which predominate over any questions affecting individual Class Members—that a class-wide proceeding can answer for all Class Members. These common questions include:

a. whether HCA had a duty to use reasonable care in safeguarding Plaintiff's and the Class's Private Information;

b. whether HCA failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. whether HCA's data-security practices met the standard of care reflected in HIPAA, guidance from HHS and the FTC, and recognized frameworks published by NIST and CIS;

d. whether HCA knew or should have known that its data-security measures were inadequate and that a breach was foreseeable;

e. whether HCA was negligent in maintaining, protecting, and securing Private Information;

f. whether HCA breached implied contractual promises to safeguard Plaintiff's and the Class's Private Information;

g. whether HCA was unjustly enriched;

h. whether HCA took reasonable measures to determine the extent of the Data Breach after discovering it;

i. whether HCA provided timely and adequate notice of the Data Breach;

j. whether the Data Breach caused Plaintiff and the Class injuries;

k. what the proper measure of damages is; and

l. whether Plaintiff and the Class are entitled to damages, declaratory relief, and/or injunctive relief.

122. **Typicality (Rule 23(a)(3)).** Plaintiff's claims are typical of Class Members' claims because each arises from the same Data Breach, the same alleged security failures by HCA, and the same unreasonable manner of notifying individuals about the Data Breach.

123. **Adequacy (Rule 23(a)(4)).** Plaintiff will fairly and adequately protect the proposed Class's common interests. Plaintiff's interests do not conflict with Class Members' interests. And Plaintiff has retained counsel experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

124. **Superiority (Rule 23(b)(3)).** A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against HCA would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

125. **Injunctive and Declaratory Relief (Rule 23(b)(2)).** HCA has acted or refused to act on grounds generally applicable to the Class, making final injunctive and corresponding declaratory relief appropriate for the Class as a whole.

126. **Issue Certification (Rule 23(c)(4)).** In the alternative, particular common issues—including the existence and breach of HCA's duties and the adequacy of its data security and notice—are appropriate for issue certification.

## VIII. CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
(On Behalf of Plaintiff and the Class)

127. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

128. Plaintiff and the Class entrusted their Private Information to HCA on the premise and with the understanding that HCA would safeguard their Private Information, use their Private Information for business purposes only, and not disclose their Private Information to unauthorized third parties.

129. HCA owed a duty of care to Plaintiff and Class Members because it was foreseeable that HCA's failure to use adequate data security in accordance with industry standards would compromise their Private Information in a data breach. And here, that foreseeable danger came to pass.

130. HCA has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and the Class could and would suffer if their Private Information was wrongfully disclosed—particularly given HCA's own prior data security incidents.

131. HCA owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom HCA knew or should have known would suffer injury-in-fact from HCA's inadequate security practices. After all, HCA actively sought and obtained Plaintiff's and Class Members' Private Information.

132. HCA owed—to Plaintiff and Class Members—at least the following duties to:

a. exercise reasonable care in handling and using the Private Information in its care and custody;

b. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized access;

c. exercise reasonable care in selecting, supervising, and limiting the system access of its vendors and other third parties;

d. promptly detect attempts at unauthorized access; and

e. notify Plaintiff and Class Members within a reasonable timeframe of any breach to the security of their Private Information.

133. Thus, HCA owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach. This duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect their Private Information, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

134. HCA also had a duty to exercise appropriate practices to remove Private Information it was no longer required to retain under applicable regulations.

135. HCA knew or reasonably should have known that the failure to exercise due care in collecting, storing, and using the Private Information of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

136. HCA's duty to use reasonable security measures also arose because of the special relationship that existed between HCA and Plaintiff and the Class—the relationship between a healthcare provider and its patients, and between an employer and its employees. That special relationship arose because Plaintiff and the Class entrusted HCA with their confidential Private Information as a necessary part of obtaining services from, or working for, HCA.

137. HCA's duty to safeguard Plaintiff's and Class Members' Private Information is independent of any contractual duty. Healthcare providers and employers that collect and maintain sensitive medical and personal information owe an independent duty of care to protect that information from foreseeable harm, regardless of whether there is a direct contractual relationship between the parties on the specific issue of data security. This independent duty is sufficient to overcome any economic loss rule defense.

138. The applicable standard of care is informed by well-established authorities, including the HIPAA Security Rule (referenced solely as a standard-of-care benchmark and not as an independent cause of action or a basis for negligence per se), and guidance and frameworks published by HHS, the FTC, NIST, the Cybersecurity and Infrastructure Security Agency, and CIS.

139. The risk that unauthorized persons would attempt to gain access to the Private Information and misuse it was foreseeable. Given that HCA holds vast amounts of Private Information, and had already experienced prior data security incidents, it was inevitable that unauthorized individuals would attempt to access HCA's systems containing the Private Information.

140. HCA improperly and inadequately safeguarded the Private Information of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

141. HCA breached these duties as evidenced by the Data Breach.

142. HCA breached its duties by failing to exercise reasonable care in supervising its agents, contractors, and vendors, and in handling and securing the Private Information of Plaintiff

and Class Members, which actually and proximately caused the Data Breach and Plaintiff's and Class Members' injuries.

143. HCA further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff's and Class Members' injuries-in-fact.

144. HCA has admitted that the Private Information of the Class was obtained by an unknown unauthorized party because of the Data Breach.

145. But for HCA's failure to exercise reasonable care, the Private Information of Plaintiff and the Class would not have been accessed and copied.

146. As a direct and proximate result of HCA's negligence, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, an increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

147. HCA's breach of its common-law duties to exercise reasonable care actually and proximately caused Plaintiff and Class Members actual, tangible injury-in-fact and damages, including, without limitation, the theft of their Private Information by criminals, improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private Information, and lost time and money incurred to mitigate and remediate the effects of the Data Breach, which injury-in-fact and damages are ongoing, imminent, and immediate.

148. Plaintiff and the Class are entitled to compensatory and consequential damages, and to injunctive and equitable relief requiring HCA to adopt and maintain reasonable security measures and to provide adequate credit and identity monitoring.

**COUNT II**
**NEGLIGENCE PER SE**
(On Behalf of Plaintiff and the Class)

149. Plaintiff incorporates by reference all paragraphs preceding Count I as if fully set forth herein.

150. Under the FTC Act, 15 U.S.C. § 45, HCA had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

151. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as HCA, of failing to use reasonable measures to protect the Private Information entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of HCA's duty to protect Plaintiff's and Class Members' sensitive Private Information.

152. HCA breached its duties to Plaintiff and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Private Information.

153. HCA violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and by not complying with applicable industry standards as described in detail herein. HCA's conduct was particularly unreasonable given the nature and amount of Private Information HCA collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

154. Plaintiff and Class Members are within the class of persons the FTC Act was intended to protect, and the harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that,

because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and members of the Class.

155. But for HCA's wrongful and negligent breach of its duties owed, Plaintiff and Class Members would not have been injured.

156. The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of HCA's breach of its duties. HCA knew or should have known that it was failing to meet its duties and that its breach would cause Plaintiff and members of the Class to suffer the foreseeable harms associated with the exposure of their Private Information.

157. HCA's violations of, and failure to comply with, Section 5 of the FTC Act constitute negligence per se.

158. As a direct and proximate result of HCA's negligence per se, Plaintiff and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**COUNT III**
**BREACH OF IMPLIED CONTRACT**
(On Behalf of Plaintiff and the Class)

159. Plaintiff incorporates by reference all paragraphs preceding Count I as if fully set forth herein.

160. Plaintiff and Class Members were required to provide their Private Information to HCA as a condition of receiving healthcare services from HCA or of their employment with HCA. Plaintiff and Class Members provided their Private Information to HCA in exchange for HCA's services or employment.

161. Plaintiff and Class Members reasonably understood that a portion of the funds paid for HCA's services, or derived from their labor, would be used to pay for adequate cybersecurity measures.

162. Plaintiff and Class Members reasonably understood that HCA would use adequate cybersecurity measures to protect the Private Information that they were required to provide based on HCA's duties under state and federal law and its internal policies.

163. Plaintiff and Class Members accepted HCA's offers by disclosing their Private Information to HCA in exchange for services or employment.

164. In turn, and through its conduct and internal policies, HCA agreed to protect and not disclose the Private Information to unauthorized persons.

165. The implied contracts included, among other things, the following implied promises: (a) taking steps to ensure that anyone granted access to Private Information also protects the confidentiality of that data; (b) restricting access to Private Information to employees and agents who are qualified and trained; (c) designing and implementing appropriate retention policies to protect Private Information; (d) applying proper encryption and/or the separation of different data sets containing Private Information; (e) implementing multifactor authentication for access to Private Information; (f) taking steps to ensure that Private Information placed in the control of HCA's employees or agents is restricted and limited to authorized business purposes; and (g) taking other reasonable steps to protect against foreseeable breaches.

166. Upon information and belief, HCA represented in its notice of privacy practices that it would protect the confidentiality of Plaintiff's and Class Members' protected health information.

167. Implicit in the parties' agreement was that HCA would provide Plaintiff and Class Members with prompt and adequate notice of all unauthorized access to and/or theft of their Private Information.

168. After all, Plaintiff and Class Members would not have entrusted their Private Information to HCA in the absence of such an agreement with HCA.

169. Plaintiff and the Class fully performed their obligations under the implied contracts with HCA.

170. The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

171. HCA materially breached the contracts it entered with Plaintiff and Class Members by:

a. failing to safeguard their information;

b. failing to notify them promptly of the intrusion into its computer systems that compromised such information;

c. failing to comply with industry standards;

d. failing to comply with the legal obligations necessarily incorporated into the agreements; and

e. failing to ensure the confidentiality and integrity of the electronic Private Information that HCA created, received, maintained, and transmitted.

172. In these and other ways, HCA violated its duty of good faith and fair dealing.

173. HCA's material breaches were the direct and proximate cause of Plaintiff's and Class Members' injuries (as detailed *supra*), including that Plaintiff and the Class did not receive the full benefit of their bargain.

174. Plaintiff and the Class are entitled to compensatory, consequential, and nominal damages, and to appropriate injunctive and equitable relief.

**COUNT IV**
**UNJUST ENRICHMENT**
(On Behalf of Plaintiff and the Class, in the Alternative)

175. Plaintiff incorporates by reference all paragraphs preceding Count I as if fully set forth herein.

176. This claim is pleaded in the alternative to Plaintiff's breach of implied contract claim.

177. Plaintiff and Class Members conferred a benefit upon HCA by providing payment for services or labor, and by entrusting HCA with their valuable Private Information, which HCA used to facilitate its services and operations.

178. HCA appreciated or had knowledge of the benefits it received from Plaintiff and Class Members.

179. HCA used Plaintiff's and Class Members' Private Information for its own business purposes, including to operate and grow its network of hospitals, facilities, and physician practices, to administer its medical residency programs, to obtain insurance reimbursements, and to otherwise profit from the provision of healthcare services.

180. Plaintiff and Class Members reasonably understood that HCA would use adequate cybersecurity measures to protect the Private Information that they were required to provide based on HCA's duties under state and federal law and its internal policies.

181. HCA enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information.

182. The payments HCA received in the ordinary course of its business included an implicit premium for data security that was supposed to be used, in part, to pay for the administrative and technical costs of providing reasonable data security and protection for Private Information.

183. Plaintiff and Class Members suffered as a direct and proximate result of HCA's failure to provide the requisite security.

184. Under principles of equity and good conscience, it would be inequitable and unjust for HCA to retain the benefits it received without providing the data security that formed part of the consideration for the parties' exchange.

185. Plaintiff and Class Members have no adequate remedy at law.

186. HCA should be compelled to disgorge into a common fund—for the benefit of Plaintiff and Class Members—all unlawful or inequitable proceeds that it received because of its misconduct, or the Court should impose a constructive trust in the amount by which HCA was unjustly enriched.

**COUNT V**
**DECLARATORY JUDGMENT**
(On Behalf of Plaintiff and the Class)

187. Plaintiff incorporates by reference all paragraphs preceding Count I as if fully set forth herein.

188. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant

further necessary or proper relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

189. In the fallout of the Data Breach, an actual controversy has arisen about HCA's duties to use reasonable data security. On information and belief, Plaintiff alleges that HCA's actions were—and still are—inadequate and unreasonable. And Plaintiff and Class Members continue to suffer injury from the ongoing threat of fraud and identity theft.

190. Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. HCA owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

b. HCA has a duty to timely notify impacted individuals of the Data Breach;

c. HCA breached, and continues to breach, its duties by failing to use reasonable measures to protect the data entrusted to it; and

d. HCA's breach of its duties caused—and continues to cause—injuries to Plaintiff and Class Members.

191. The Court should also issue corresponding injunctive relief requiring HCA to use adequate security consistent with industry standards to protect the data entrusted to it.

192. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy if HCA experiences yet another data breach.

193. And if another breach occurs, Plaintiff and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—

while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiff's and Class Members' injuries.

194. If an injunction is not issued, the resulting hardship to Plaintiff and Class Members far exceeds the minimal hardship that HCA could experience if an injunction is issued.

195. An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiff, Class Members, and the public at large.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court enter judgment against HCA and enter an order:

A. Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as Class Representative, and appointing undersigned counsel as Class Counsel;

B. Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiff and the Class;

C. Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class, including, without limitation, requiring HCA to: (i) engage independent third-party security auditors to conduct periodic testing of its systems, including penetration testing; (ii) encrypt Private Information and implement appropriate access controls, including multifactor authentication; (iii) implement appropriate oversight of, and limits on, vendor and third-party access to its systems; (iv) segment data and implement appropriate network monitoring, logging, and intrusion detection; (v) purge, delete, and destroy Private Information no longer necessary for its business purposes; (vi) routinely train its workforce on data

security; and (vii) provide Class Members with adequate credit monitoring and identity-theft protection;

D. Awarding Plaintiff and the Class damages, including applicable compensatory, consequential, and nominal damages, as allowed by law;

E. Awarding restitution and disgorgement, as pleaded in the alternative;

F. Awarding attorneys' fees, costs, and litigation expenses, as allowed by law;

G. Awarding prejudgment and post-judgment interest, as provided by law;

H. Granting Plaintiff and the Class leave to amend this Complaint to conform to the evidence produced at trial; and

I. Granting such other and further relief as the Court deems just and proper.

## X. DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: November 3, 2026

Respectfully submitted,


*<u>/s/ Mark E. Silvey</u>*
Mark E. Silvey (TN. Bar No. 013415)
**BRYSON HARRIS SUCIU & DEMAY PLLC**
900 West Morgan Street
Raleigh, North Carolina 27603
P: (919) 600-5003
msilvey@brysonpllc.com

Scott J. Falgoust*
**BRYSON HARRIS SUCIU & DEMAY PLLC**
5301 Canal Boulevard
New Orleans, LA 70124
(919) 585-5634
sfalgoust@brysonpllc.com

Andrew W. Ferich*
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Telephone: (310) 474-9111
aferich@ahdootwolfson.com

**Pro hac vice* application forthcoming

*Attorneys for Plaintiff and the Proposed Class*